1:25-mc-00042

## CONTINUATION PAGES OF SEARCH WARRANT

…hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Pennsylvania State Trooper and have been since November 2007. I am currently assigned as a full-time Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since January, 2021. I am a graduate of Kutztown University in Kutztown, PA with a Bachelor of Science degree in Criminal Justice. I also attended Carlow University in Pittsburgh, PA and obtained a Graduate Certificate in Cyber Threat Analytics. I am currently assigned to the ATF Philadelphia Field Division, Harrisburg Field Office, which is comprised of ATF Special Agents whose primary responsibilities include investigating individuals or groups who have committed violations of the federal firearms and narcotics laws.

2. After graduating from the Pennsylvania State Police (PSP) Academy, I was assigned to the patrol unit at Troop J, Embreeville in Chester County. In 2010, I transferred to patrol at Troop J, Ephrata in Lancaster County. From 2011 to 2012, I was assigned to the Criminal Investigation unit at Troop J, Embreeville in Chester County. In 2012, I

transferred to the Criminal Investigation unit at Troop J, Lancaster in Lancaster County. In June of 2014, I transferred to the Bureau of Criminal Investigation (BCI), Organized Crime Unit Eastern Task Force. Within BCI, my responsibilities included conducting investigations of corrupt organizations relating to illegal narcotics, public corruption, gambling, and organized crime activities throughout the Commonwealth of Pennsylvania; in particular, central Pennsylvania. In my capacity as a Pennsylvania State Trooper, I have investigated numerous violations of the Pennsylvania Crimes Code. These crimes include homicide, robbery, burglary, tampering with evidence, theft, narcotic violations, forgery, sexual assaults, child abuse and corrupt organizations. I have prepared and sworn to or filed numerous criminal complaints for violations of the Pennsylvania Crimes Code. I have also sworn to and executed search warrants in Pennsylvania. In addition, I have obtained telephone and financial records for various criminal investigations. In these investigations, I have utilized numerous investigative techniques including, but not limited to, interviewing victims, witnesses and suspects/defendants; execution of search warrants; use of informants; undercover operations; physical surveillance; analyzing information

obtained from court-ordered pen registers and trap and trace intercepts, and analyzing telephone toll information; grand jury proceedings; and the use of consensual interceptions of communications within the parameters of the Pennsylvania Wiretapping and Electronic Surveillance Control Act. I am an "investigative or law enforcement officer" within the meaning of Section 5702 of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, and in such capacity, I have successfully completed a course which is required for Class "A" certification pursuant to 18 Pa.C.S. Section 5724. My Class "A" certification number is A-4660.

3. I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for search and seizure warrant for the person of Dereese Marcel Williams (DOB: 4/17/1994) (or the SUBJECT), as described in Attachment A, to obtain oral secretion (epithelial cells) by rubbing cotton swabs against the inner cheek lining of the SUBJECT's mouth cavity, in sufficient quantity for scientific examination and comparison for DNA typing and DNA comparison, as described in Attachment B. Currently, Williams is an inmate at the Dauphin County Prison in Harrisburg, Pennsylvania in Dauphin County, Pennsylvania.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of Title 18, United States Code, Section 922(g), Possession of a Firearm by a Prohibited Person have been committed by Dereese Marcel Williams, last residing at 628 Vander Avenue, York, PA 17403. There is also probable cause to believe the SUBJECT's DNA, obtained from buccal swabs, will reveal evidence of WILLIAMS'S possession of firearms.

## JURISDICTION

5. "At the request of a federal law enforcement officer or an attorney for the government . . . a magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located within the district." Fed. R. Crim. P. 41(b)(1).

## INVESTIGATION BACKGROUND

### A. September 30, 2021 Traffic Stop and Arrest

6. On September 30, 2021, Trooper Christopher Jay of Pennsylvania State Police Troop J (York Patrol Unit) was in full uniform and operating a marked patrol unit on Interstate 83 (I-83) south around mile marker 19, Springettsbury Twp, York County, Middle District of PA. Trooper Jay observed a silver KIA Optima with Pennsylvania

registration plate LHA0231 do the following: weave in its lane; ride the right line designator; and cross the center lane designator multiple times. Trooper Jay initiated a traffic stop on I-83 south at approximately mile marker 18.

7. Trooper Jay approached the driver side front window and the vehicle's operator accelerated from the traffic stop. The operator was positively identified as Dereese Williams. At the time of the traffic stop, Williams's operating privilege was suspended.

8. Upon fleeing from the traffic stop, Williams attempted to exit the interstate on the Mount Rose exit, at a high rate of speed, causing him to lose control of his vehicle and drive over the center median of Mount Rose Avenue. The vehicle struck the guiderail located on the eastbound shoulder of Mount Rose Avenue. Upon approach of the vehicle, Trooper Jay observed Williams to be wearing light-colored pants as he crawled out of the driver side front window. Williams fled on foot into brush also located on the eastbound side of Mount Rose Avenue. The vehicle's front seat passenger was apprehended and identified as Juan

Cruz.[1] Cruz was transported from the scene by ambulance due to head, shoulder, and neck injuries.

9. Troopers located Williams nearby, hiding in heavy brush. Williams had bloodshot eyes and a strong odor of alcoholic beverage emanating from his breath and person. Troopers read Williams his Miranda rights and requested that he submit to standardized field sobriety exercises, which he refused. Williams also refused consent to search his vehicle and was subsequently placed under arrest. A search incident to arrest yielded a clear plastic bag containing a white powdery rock like substance. Troopers read Williams his implied consent chemical test warnings and Williams refused to submit to chemical testing.

B. Recovery of Drugs and Firearms

10. Trooper Jay detected a strong odor of marijuana emanating from inside the vehicle. Trooper Jay further observed in plain view, approximately three clear plastic bags containing suspected marijuana. The vehicle was towed from the scene to PSP York, pending a search

---

[1] An April 3, 2024 review of CRUZ's criminal history indicates the West Manchester Township Police Department arrested CRUZ on September 28, 2023 for disorderly conduct and resisting arrest. No court disposition has been provided for this arrest. I am unaware of any other criminal history for CRUZ.

warrant. Upon moving the vehicle, a loaded black .22 caliber Phoenix Arms HP 22A handgun bearing serial number 4533130 was located on the driver side of the vehicle between the vehicle and the guiderail. Williams is a person not to possess a firearm.

11.     PSP obtained and executed a search warrant on the gray Kia Optima and located several items: a loaded black Masada 9MM handgun bearing serial number M1013623 resting on top of the brake pedal; narcotics; a red iPhone in a black case located on the driver's side floor; and a red iPhone located on the driver's side seat. See the below photos:





### C.     December 12, 2024 Kassandra Rivera-Guzman Interview

12. On December 12, 2024, I and Agent Steve Ludman interviewed Kassandra Rivera-Guzman at the York City Police Department. Rivera-Guzman was asked about her 9mm pistol, and she immediately mentioned the firearm being the one Williams was caught with. I asked Rivera-Guzman about her current relationship with Dereese Williams. Rivera-Guzman said they were no longer in a relationship, but they have three children together.

13. Rivera-Guzman was asked about the night Dereese Williams was arrested, September 30, 2021, and whose car he was driving. Rivera-Guzman said that it was a shared vehicle between she and Williams. Rivera-Guzman said she and Williams got into a fight the night he was arrested, and Williams left to go pick up her brother, Juan Cruz, from work.

14. Rivera-Guzman was questioned about her 9mm pistol and where it was in the vehicle on the night Williams was arrested. Rivera-Guzman said the firearm was in the car, she believed under the driver's seat. Rivera-Guzman related Williams should have known the firearm was in the car. Rivera-Guzman said she knew Williams was a felon and not supposed to be around guns. Rivera-Guzman said that Williams had taken the vehicle multiple times knowing that there was a firearm under the driver's seat.

15. I asked Rivera-Guzman where the 9mm was normally kept. Rivera-Guzman said she normally kept the 9mm in the house (when she first got it for about a week), then it was kept on a shelf in the garage because she had little kids and no safe.

16. I asked Rivera-Guzman if she knew the location of the .45 caliber handgun that she had purchased on July 30, 2020 (approximately 46 days prior to her purchase of the Masada 9MM handgun). Rivera-Guzman said she had no idea where the .45 caliber handgun was. Rivera-Guzman said looked for the .45 caliber handgun for some time and could not find it. Rivera-Guzman said she had the box for it in the garage, but the firearm was no longer in it. Rivera-Guzman said she didn't know if she should report the .45 caliber handgun stolen since it had been approximately four years since she saw it. Rivera-Guzman said she asked Williams where it was, and he told her he did not know.

17. Rivera-Guzman was asked which handgun she purchased first, the 9mm or the .45 caliber. Rivera-Guzman said she did not know the difference, she "really isn't a gun person;" she just bought it for protection. Rivera-Guzman then said she bought the 9mm second, after she purchased the .45 caliber handgun from Freedom Armory. Rivera-Guzman was asked if she bought anything else with the firearms such as ammunition, accessories, etc. Rivera-Guzman said she did not purchase ammunition when she purchased the .45 caliber handgun. She said she purchased ammunition when she purchased the 9mm. Rivera-Guzman

said that Williams was in the store with her when she purchased both firearms and he told her which ones to buy. Rivera-Guzman said that Williams persuaded her to buy the firearms for her protection. Rivera-Guzman said she and Williams were living together at the time at 628 Vander Ave in York, Pennsylvania. Rivera-Guzman further said she has always had a fear of guns, but Williams convinced her to purchase them for protection. Rivera-Guzman was asked if she ever fired either gun to which she stated, no. Per Rivera-Guzman, Williams offered to show her how to shoot the pistols, but she declined. Rivera-Guzman said she never obtained a concealed carry permit.

18. Rivera-Guzman said the other gun that was in the car the night Williams was arrested (the .22 caliber Phoenix Arms HP 22A handgun) belonged to her brother, Juan Cruz. Rivera-Guzman said that Cruz always had a firearm on him, and that she believed it was registered to his ex-wife. Rivera-Guzman said the gun was not in Cruz's name. Rivera-Guzman said that she told both Cruz and Williams that they should talk to the police and take responsibility for their actions. Rivera-Guzman said Cruz told her he did not want to be involved and did not want to talk without an attorney. Rivera-Guzman said Cruz did not have

a concealed carry permit. Rivera-Guzman said Williams is a felon so he cannot obtain a concealed carry permit.

### D. December 16, 2024 Kassandra Rivera-Guzman Interview

19. On December 16, 2024, Assistant U.S. Attorney David C. Williams and I contacted Rivera-Guzman via cellphone to ask some follow up questions.

20. Rivera-Guzman was asked about September 30, 2021, the night she and Dereese Williams argued and what it was over. Rivera-Guzman said they argued over their kids and Dereese Williams felt like he needed to leave before the situation got out of hand. Dereese Williams left the residence and went to pick up Rivera-Guzman's brother, Juan Cruz because Cruz had called for a ride.

21. Rivera-Guzman was asked where the 9mm firearm was kept. Rivera-Guzman said the 9mm firearm was always kept in the garage or in the vehicle, but on September 30, 2021, it was in the vehicle. Rivera-Guzman said the firearm goes back and forth from the garage to the vehicle. Rivera-Guzman said she put the gun in the car. Per Rivera-Guzman, Dereese Williams never saw her put the gun under the seat. Rivera-Guzman said the only time she would tell Dereese Williams if the

gun was in the car was when they were going to the shooting range. Rivera-Guzman advised the only time she went to shoot was at Freedom Armory, but neither she nor Dereese Williams fired the 9mm.

22. Rivera-Guzman was asked if Dereese Williams knew the firearm was in the car the night of September 30, 2021. Rivera-Guzman did not necessarily tell Williams that the gun was in the vehicle, but said he knew the gun was in the vehicle or on the shelf in the garage. Rivera-Guzman was asked how Williams knew the gun was in the car. Rivera-Guzman was unable to explain.

23. Rivera-Guzman said Dereese Williams went along with her to the gun store and picked out which gun she should buy. Williams offered to show Rivera-Guzman how to shoot it.

24. Rivera-Guzman was asked why she would take the gun out of the box on the garage shelf and put it under the vehicle's driver seat. Rivera-Guzman said she did not know. Per Rivera-Guzman, she would put the gun under the driver's seat anytime she was driving except when she went to work.

25. Rivera-Guzman was asked if the .45 caliber handgun or the 9mm handgun was purchased first. Rivera-Guzman said she purchased

the .45 caliber handgun first. Rivera-Guzman said she purchased it because she wanted a gun for protection. Rivera-Guzman said she later decided she was "not really a gun person." Rivera-Guzman said Dereese Williams suggested for her to purchase the gun because she was able to obtain a gun license. Rivera-Guzman said she purchased the gun Williams suggested. Rivera-Guzman said she took the .45 to the gun range, but she never shot it. Williams went to the range with her but did not shoot the gun. Rivera-Guzman said she kept the .45 caliber handgun on the garage shelf, like how she kept the 9mm handgun on the shelf. Rivera-Guzman said she never told her brother or anyone else about the .45 or the 9mm handguns. Rivera-Guzman denied selling the .45 caliber handgun to anyone. Rivera-Guzman also said Williams did not sell the .45 caliber handgun to anyone. Rivera-Guzman said she realized the .45 caliber handgun went missing approximately two months before she bought the 9mm handgun. Rivera-Guzman said she had to get her "money together" to purchase the 9mm. Rivera-Guzman said when she noticed the .45 caliber handgun went missing, she told Williams who told her to report it stolen. Rivera-Guzman said she purchased the 9mm because she thought she had the "courage" to possess the firearm. Rivera-

Guzman only had the box the 9mm came in, no lock or safe for the firearm. Rivera-Guzman said she had two kids (ages 10 and one) living with her and was pregnant with her third at the time of purchase.

26. Rivera-Guzman was asked if Dereese Williams ever showed her how to operate the gun. Rivera-Guzman said she never saw Williams handle the gun. Rivera-Guzman was asked if her or Williams's fingerprints would be on the gun. Rivera-Guzman said she was unsure. Rivera-Guzman said she did not know what Williams did behind her back.

### E.  Dereese Williams's Criminal History

27. Dereese Williams's criminal history includes the following convictions:

    a. On August 1, 2013, Williams pleaded guilty to Possession with Intent to Deliver [Cocaine], in violation of 35 Pa. Stat. § 780-113 (a)(30) and was sentenced to 17 months imprisonment. CP-67-CR-0002529-2013;

    b. On August 12, 2016, Williams pleaded guilty to Person Not to Possess Firearms, in violation of 18 Pa. Stat. § 6105(a)(1) and

was sentenced to 5 months imprisonment. CP-67-CR-0001890-2016;[2]

    c.    On August 12, 2016, Williams pleaded guilty to Possession with Intent to Deliver [Cocaine], in violation of 35 Pa. Stat. § 780-113 (a)(30) and was sentenced to 5 months imprisonment. CP-67-CR-0001478-2016;

    d.    On October 16, 2018, Williams pleaded guilty to Possession with Intent to Deliver [Cocaine and Marijuana], in violation of 35 Pa. Stat. § 780-113 (a)(30) and was sentenced to 2 years IPP. CP-67-CR-0003898-2018;

## DNA EVIDENCE

28.    Based on my training and experience, I know that when a person handles a weapon, he or she may leave behind traces of DNA

---

[2] During the August 12, 2016 guilty plea colloquy, the Court engaged Williams as follows: "THE COURT: Case 1890 of 2016, your plea is to count 3 and count 4. Count 3 alleging that on the 4th day of February of 2016, you possessed a firearm, in this case it is a .45-caliber Taurus revolver, after having previously been convicted of an enumerated offense that prohibits you or disqualifies you from possessing a firearm. THE DEFENDANT: Yes. THE COURT: Did you do that? THE DEFENDANT: Yes, sir."

where he or she touched. This DNA can be recovered and examined by experts at a forensic laboratory, and a DNA profile may be obtained.

29. Based on my training and experience, I am aware that a forensics laboratory can conduct a comparison of a sample to any recovered DNA if it obtains buccal cavity swabs, that is, in this case, swabs from inside the cheek area of Dereese Williams. The DNA profile obtained through such swabs can be compared with any DNA profile derived from the above-described Masada 9mm handgun with serial number M1013623 and the Phoenix Arms .22 Caliber Model HP 22A handgun with serial number 4533130 Trooper Jay recovered during the traffic stop of Williams.

## CONCLUSION

30. Based on the above facts, I believe there is probable cause to believe that Williams has engaged in the possession of a firearm by a convicted felon in violation of Title 18, United States Code, Section 922(g), Possession of a Firearm by a Prohibited Person. Comparing Williams's DNA profile to any DNA profile obtained from the Masada 9mm handgun with serial number M1013623 and the Phoenix Arms .22 Caliber Model HP 22A handgun with serial number 4533130 would

provide evidence related to the possession of firearms from the traffic stop Trooper Jay conducted on September 30, 2021.

31. Thus, there is probable cause to search the person of Williams to seize, for further testing and analysis by laboratory personnel, the following:

> <u>ORAL SECRETION (EPITHELIAL CELLS)</u> obtained by rubbing cotton swabs against the cheek lining of the mouth, in sufficient quantity for scientific examination and comparison for Deoxyribonucleic Acid (DNA) typing and DNA comparison.

32. ATF seeks the DNA of Dereese Marcel Williams so that it can obtain a laboratory comparison to any DNA obtained from the Masada 9mm handgun, serial number M1013623 and a Phoenix Arms .22 Caliber Model HP 22A handgun, serial number 4533130, as discussed above.